IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BRYAN WAYNE DAVENPORT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 5:20-cv-00358-J |
| ) | |
| BECKY PATA. ) | |
| ) | |
| Defendant. ) | |

**AFFIDAVIT OF BECKY PATA, APRN-CNP**

Affiant, Becky Pata, APRN, after being duly sworn, states:

1. I am over the age of eighteen (18) and competent to testify to the matters herein.

2. I am an Advanced Practice Registered Nurse, Certified Nurse Practitioner ("APRN-CNP") with over thirty-five (35) years of experience in nursing.

3. Since November 2017, I have been employed by Turn Key Health Clinics, LLC ("Turn Key") as a nurse practitioner.

4. Turn Key has in place a contract with the Cleveland County to provide medical services in the Cleveland County Detention Center ("CCDC").

5. In my capacity as a nurse practitioner for Turn Key, I provide medical services to patients incarcerated in various correctional facilities, including CCDC.

**EXHIBIT 9**

6. I have never been employed as a full-time on-site provider at the CCDC, including in July 2019. Therefore, I rely upon the judgment of the nurses who are on site to schedule my provider appointments and to provide me with information about patients.

7. In my scope of practice as a nurse practitioner, I prescribe medications and order off-site specialty appointments as indicated by the individual clinical circumstances.

8. It is not within my scope of practice to coordinate scheduling off-site specialty appointments I order. Instead, the nurses on site are responsible for implementing my orders, including scheduling off-site specialty appointments.

9. At any given point in time, I am not aware of which patients are still incarcerated at a given facility versus those who have been transferred to other facilities or released from incarceration. Therefore, I rely upon the on-site nurses at the facilities to triage and schedule any patients needing care for appointments with me at the facility based on their unique patient circumstances and the nurses' independent judgment as to priority. This would include chronic care visits and sick call visits.

10. Our normal routine and practice at the CCDC is that the nurse will compile a list of patients to be seen by me for my next regularly scheduled provider appointment at a given jail, and when I arrive on site the detention staff will bring the patients to the medical office for me to see in clinic.

11. Due to the nature of correctional facilities, it is common for patients whom I have seen in clinic and have scheduled for follow-up and testing, as well as off-site specialty appointments, to be released before their follow-up appointment with me and/or before their off-site specialty appointments or testing can be completed.

EXHIBIT 9

12. It is also common for it to take several months to schedule off-site specialty appointments due to our patients' incarceration status.

13. Because of the nature of inmates commonly being released and transferred to other correctional facilities and the normal delays associated with scheduling inmates for off-site specialty appointments, I would not ordinarily notice if I have ordered an off-site specialty appointment but do not receive a report from the off-site facility, and this would not put me on notice that an appointment I ordered had not been implemented.

14. On July 22, 2019, I met and examined Bryan Wayne Davenport for the first time in the Chronic Care Clinic of the CCDC.

15. During this encounter, Mr. Davenport complained of hip pain and reported a past medical history of hypertension (high blood pressure) and HIV. Mr. Davenport further informed me that he had not had any medications for these conditions for approximately five months preceding his incarceration at the CCDC.

16. From my personal observations, based on my education, training, experience, and medical judgment, Mr. Davenport's medical condition was stable on July 22, 2019.

17. Based on my professional clinical experience and medical judgment, I prescribed Mobic for Mr. Davenport's hip pain and ordered blood pressure checks to monitor his hypertension.

18. Based on my professional clinical experience and diagnosis of Mr. Davenport, I ordered that Mr. Davenport receive blood pressure checks to monitor his hypertension, and I also ordered that he be scheduled for an off-site specialty consultation at OU Infectious Disease Institute for his HIV diagnosis.

EXHIBIT 9

19. Mr. Davenport's blood pressure was not high enough to warrant medication management, and the risks of beginning medications exceeded any benefit to his condition. I did recommend medication management at a later date.

20. The care and treatment I provided to Mr. Davenport on July 22, 2019, was appropriate and within the standard of care.

21. I expected that the on-site nurse at the CCDC would schedule Mr. Davenport's Infectious Disease off-site appointment that I ordered, as this was their normal custom and practice and they always did a good job of consistently implementing my provider orders.

22. I was not aware that my order for Mr. Davenport's Infectious Disease off-site appointment had not been implemented by the nurse.

23. At the time, CCDC had a grievance procedure where inmates could submit concerns/disagreements related to their medical care. However, unbeknownst to Turn Key staff (including myself), detention staff never forwarded medical grievances to Turn Key personnel. As a result, no Turn Key personnel (including myself) were ever aware of Mr. Davenport's grievance related to his off-site Infectious Disease appointment not being scheduled.

24. On or about July 8, 2020, I was notified of this lawsuit. This was the first time I became aware that Mr. Davenport's off-site Infectious Disease appointment had not been scheduled.

25. I learned that the on-site nurses inadvertently failed to schedule Mr. Davenport's off-site specialty HIV appointment by mistake.

**EXHIBIT 9**

26. On this same day, I immediately placed another order for Mr. Davenport to have his off-site Infectious Disease appointment scheduled.

27. Jennifer Jones, RN, the Nurse Manager at that time, immediately contacted OU Infectious Disease to schedule Mr. Davenport's appointment, and she was told that the earliest they would schedule Mr. Davenport for an appointment would be December 2020. During this conversation, OU Infectious Disease instructed us to obtain blood work for Mr. Davenport to prepare for his off-site appointment.

28. Nurse Jones and I attempted to expedite Mr. Davenport's appointment, and OU Infectious Disease informed us that they may be able to schedule him more quickly depending on his lab results.

29. On July 8, 2020, I saw Mr. Davenport in clinic. In my professional medical judgment, Mr. Davenport was clinically stable at this time except for his complaint of a fungal rash.

30. For his rash, I prescribed him Diflucan (an antifungal medication) and Terbinafine cream (an anti-fungal cream to treat fungal rashes such as jock itch, athlete's foot, and ringworm.

31. To assess Mr. Davenport's overall medical condition, I ordered a chest x-ray, blood lab work (an HIV viral load test, CD4, FLP, and CMP), and blood pressure checks.

32. During this appointment, Mr. Davenport refused to allow us to draw his labs because he was displeased with the care he was receiving from Turn Key.

**EXHIBIT 9**

33. During this encounter, I explained to him that it could take some time to schedule his OU Infectious Disease appointment, but if he allowed us to draw his labs now, we might be able to get him in for his Infectious Disease appointment more quickly.

34. Mr. Davenport still refused the labs but told me he would think about it.

35. The next day, Mr. Davenport's x-ray was scheduled at CCDC. On that day, July 9, 2020, Mr. Davenport refused both the x-ray and the labs.

36. On July 13, 2020, I again saw Mr. Davenport in clinic to implore him to allow us to draw his labs and complete his x-ray so that we could try to expedite his OU Infectious Disease Appointment.

37. Mr. Davenport refused to have his pre-appointment workup done at the CCDC and also stated he did not want to take his ordered medications because of his pending lawsuit (this lawsuit).

38. I expressed concern to Mr. Davenport about his decision-making and told him that his skin fungal infection could worsen if he refused to take the medication and that if he would allow us to complete his labs, we might be able to have him seen sooner at OU Infectious Disease.

39. Mr. Davenport steadfastly refused his labs and asked that they be drawn at OU Infectious Disease.

40. Mr. Davenport also demanded that I instruct the detention staff to stop requesting him to sign Refusal of Treatment forms every time he refused his prescribed treatments. I did not agree to this, as it is appropriate to document that a patient has been counseled of the risks of refusing treatment when a patient refuses medical care.

**EXHIBIT 9**

41. After this encounter, I made a specialty request to have Mr. Davenport transported to OU Infectious Disease to have his labs drawn. This request was approved by my Medical Director, and the nurse began attempting to coordinate with OU Infectious Disease to schedule this appointment.

42. When Nurse Jones contacted OU Infectious Disease to try to schedule an appointment to have his labs drawn there, OU Infectious Disease informed her that they do not complete lab draws in their clinic.

43. The same day, I wrote a letter to Mr. Davenport imploring him to be compliant with his medical care so that we could facilitate his off-site treatment with OU Infectious Disease.

44. Two days later, on July 15, 2020, I renewed Mr. Davenport's Diflucan and Terbinafine cream prescriptions because I was informed he had begun to take his medications and I wanted him to have the full length of appropriate treatment.

45. I saw Mr. Davenport again on July 20, 2020, at which time he remained medically stable, and his rash was improving.

46. On July 21, 2020, Nures Jones again called OU Infectious Disease and requested that their physician fax lab orders. These were received by Turn Key on July 22, 2020.

47. When Nurse Jones presented the OU Infectious Disease physician orders for the same lab work we had been attempting to draw in house at the CCDC, Mr. Davenport finally consented to allowing Turn Key staff to draw the labs on July 22, 2020.

**EXHIBIT 9**

48. I saw Mr. Davenport again in Clinic on July 27, 2020. At that time, we had not yet received all of his lab results, but his rash was mostly resolved and Mr. Davenport denied needing further medication.

49. On August 3, 2020, I informed Mr. Davenport of his lab results, which indicated that his viral levels of HIV had increased from his historic baseline, but his HIV had not progressed to AIDS.

50. At this same time period, the nurse had forwarded his lab results to OU Infectious Disease and was actively working with OU Infectious Disease to try to obtain medication orders for his HIV while he waited for his off-site appointment.

51. On August 6, 2020, Nurse Jones was able to get OU Infectious Disease to move Mr. Davenport's off-site appointment from December 2020 to October 19, 2020. She continued to try to obtain medication orders from OU Infectious Disease so we could start treatment at CCDC before his off-site appointment.

52. On August 10, 2020, Dr. McGee from OU Infectious Disease called Nurse Jones and gave her orders to start Mr. Davenport on Genvoya 1 tablet every day. Nurse Jones immediately implemented this order and requested that the pharmacy stock Mr. Davenport's Genvoya medication.

53. The cost of Mr. Davenport's treatment was never a part of my medical decision-making.

54. Mr. Davenport began receiving his Genvoya as soon as the pharmacy delivered it to the CCDC, which was on or around August 12, 2020.

EXHIBIT 9

55. After receiving his prescription Genvoya, Mr. Davenport's HIV levels reduced to a nondetectable level.

56. The last time I saw Mr. Davenport in clinic, he was medically stable and not symptomatic for HIV.

57. I never ignored or disregarded Mr. Davenport's medical needs.

58. I never denied or delayed Mr. Davenport access to care.

59. On the contrary, Mr. Davenport caused delays in his own care when he exercised his patient autonomy in refusing labs and x-rays at the CCDC.

AFFIANT FURTHER SAYETH NOT

_Becky Pata_ (signature)
Becky Pata

SUBSCRIBED and sworn before me this 27 day of September, 2023.

My commission expires: 08/07/27

Notary Public: Nataliya Worcester (signature)

[Notary Seal: NATALIYA WORCESTER, NOTARY PUBLIC, STATE OF OKLAHOMA, #19007947, EXP. 08/07/27]

**EXHIBIT 9**